# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW JERSEY
 2
     CIVIL NO.: 17-CV-03843 (KSH) (CLW)
 3
     ------------------------------
 4   JANE DOE 1, individually and on
     behalf of all other persons
 5   similarly situated,

 6

 7                         Plaintiff,

 8

 9                                        DEPOSITION OF:
                                          BANC PERO
10              vs.

11   BANC, JACK & JOE, LLC d/b/a
     TITILATIONS GO-GO-BAR, BANC
12   PERO, JOSEPH CARERI, JACK
     PERO, ABC COMPANIES 1-10 and
13   JOHN DOES 1-10,

14                         Defendants.

15   ---------------------------------------

16         TRANSCRIPT of the testimony of BANC PERO in
     the above-entitled matter, as taken by and before
17   CELESTE A. GALBO, a Certified Court Reporter and
     Notary Public of the State of New Jersey, held at the
18   offices of Florio Perrucci Steinhardt & Fader, LLC,
     218 Route 17 North, Rochelle Park, New Jersey, on
19   November 20, 2018, commencing at 10 a.m.

20

21          QUANTUM LEGAL SOLUTIONS
      Certified Court Reporters & Videographers
22         23 Vreeland Rd Suite 204
              Florham Park, Nj
23             1(866)497-2402
          www.quantumlegalsolutions.com

24

25
```

### Page 2

```
1  A P P E A R A N C E S:
2
3
4      BRACH EICLER, P.C.
5      BY:  LUCAS A. MARKOWITZ, ESQ.
6           101 Eisenhower Parkway
7           Roseland, New Jersey 07068
8      973-364-8302
9      lmarkowitz@bracheichler.com
10     Attorneys for the Plaintiff, individually and
11     on behalf of others similarly situated
12
13
14     FLORIO PERRUCCI STEINHARDT & FADER, LLC
15     BY:  PADRAIG P. FLANAGAN, ESQ.
16          218 Route 17 North
17          Rochelle Park New Jersey 07662
18     908-878-0131
19     pflanagan@floriolaw.com
20     Attorneys for the Defendants
21
22
23
24
25
```

### Page 3

```
1                    INDEX
2
3  WITNESS                             PAGE
4  BANC PERO
5  BY MR. MARKOWITZ                     4
6
7
8                  E X H I B I T S
9
10
11 DEFENDANT'S    DESCRIPTION           PAGE
12
13 Exhibit 1 Notice to Take Deposition of Banc,
           Jack & Joe, LLC d/b/a Titilations
14         Go-Go-Bar                    24

15 Exhibit 2 Complaint and Jury Demand   35

16 Exhibit 3 Defendants' Answer to Plaintiffs'
           Complaint with Affirmative Defenses  35
17 Exhibit 4 Defendant Banc Jack & Joe, LLC's
           Responses to Plaintiff's First Set
18         of Interrogatories           36
   Exhibit 5 Dancer Information and Rules, Bates
19         stamped D 000009 to 11       37

20 Exhibit 6 document Bates stamped P 00003
           to 00016                     42
21 Exhibit 7 document Bates stamped D 000089
           to 93                        61
22
   Exhibit 8 Day Planner, Bates stamped D 000001
23         to 000008                    92
   Exhibit 9 screenshot of Titilations website   147
24 Exhibit 10 screenshot of Titilations Instagram
             account                    152
25        (Exhibits retained by counsel.)
```

### Page 4

```
1  BANC PERO, stating a business address of 12 Willow
2  Street, Bloomfield, New Jersey 07003, having been
3  duly sworn by the Notary Public, was examined and
4  testified as follows:
5  EXAMINATION
6  BY MR. MARKOWITZ:
7      Q.   Mr. Pero, my name is Luke Markowitz.
8  I'm the attorney for the plaintiffs in this action,
9  Jane Doe 1 vs. Banc, Jack & Joe, LLC d/b/a
10 Titilations Go-Go-Bar, against Banc Pero, Joseph
11 Careri, Jack Pero and some unnamed defendants.
12          Have you ever had your deposition taken
13 before?
14     A.   I have.
15     Q.   You have.  When was that?
16     A.   15 years ago, give or take.
17     Q.   And what was that deposition in
18 relation to?
19     A.   An accident suffered by a client --
20 excuse me, a patron of mine.
21     Q.   Okay.  Even though you've been deposed
22 before, I'm just going to go through some ground
23 rules just so that we're on the same page about how
24 this should go.  So this is going to be a
25 question-and-answer format.  You probably already
```

### Page 5

```
1  know that.  I'm going to ask questions, you're going
2  to give me answers, the stenographer is going to take
3  down everything that we say here today.  Do you
4  understand that?
5      A.   Yes.
6      Q.   Okay.  And because the stenographer is
7  taking down everything we say, I need verbal
8  responses.  So like yes, no, rather than um-hum or
9  uh-uh.  Do you understand that?
10     A.   Yes.
11     Q.   Okay.  Again, also, it's human nature
12 for people to sort of try and anticipate what someone
13 else is asking.  I do it all the time and I try and
14 jump in and answer before people are done asking the
15 question.  I don't want us to do that today, though.
16 Please let me just finish the entire question and
17 then I'll give you time to give your whole answer.
18 Otherwise, it may be that I was asking something
19 different, we got to go back and it will keep you
20 here longer than you need to be.  Okay?
21     A.   Understood.
22     Q.   Okay.  If you don't understand a
23 question, ask me to rephrase, otherwise I'll assume
24 that you understood it.  Do you understand that?
25     A.   Yes.
```

22

1  Q. Okay.
2  A. We have 180 shifts. That means we have
3  anywhere from -- since a dancer generally works one
4  or two shifts, there's obviously a smaller number of
5  dancers than 180. The exact number, I'm not sure.
6  Q. Could you approximate how many
7  different dancers work in any one week?
8  A. If you were to ask me for
9  approximation, I would say 90.
10 Q. Okay. And what is the turnover like at
11 Titilations with respect to dancers?
12 A. As compared to?
13 Q. So, what I'm trying to get at is, if 90
14 dancers work in a week, different dancers, how many
15 different dancers would you say work over the course
16 of a year?
17 A. It's an impossible number for me to
18 guess. A large number, more than that.
19 Q. Okay. And what I'm getting at is, do
20 dancers typically come and go more than, let's say,
21 other professions?
22 A. By a huge number.
23 Q. Okay. Okay. Is there somewhere that
24 there are records which reflect all the dancers that
25 have been hired and fired over the past year?

23

1  A. Yes.
2  Q. And where are those records kept?
3  A. In my computer and in files.
4  Q. And when you say the records are kept
5  in your files and on your computer, what records
6  reflect how many dancers have come and gone over the
7  course of, let's say, a year?
8  A. I guess -- well, that's a hard question
9  to answer because if you're in my files, there's
10 operating -- okay, if you're my files, there's
11 operating, it would show the date that you were
12 hired. So that would indicate that they were there
13 during the course of the past year. If you were in
14 my computer under the auspice of fired, it would show
15 when you were gone. So I guess that's the best way I
16 could put that.
17 Q. If a dancer leaves voluntarily without
18 getting fired, is that dancers information moved to
19 the fired file?
20 A. No.
21 Q. If a dancer leaves on her own
22 voluntarily rather than being fired, how do you keep
23 a record of that?
24 A. We do not.
25 Q. Okay. Would it be fair to say that a

24

1  dancer's stage name if they left on their own
2  volition would no longer appear on the scheduling?
3  A. Yes, unless another dancer had the same
4  name.
5  Q. Okay. And we will get back to the
6  changing of stage names. Okay. Let's do some
7  housekeeping. Are you appearing here today pursuant
8  to what is called a 30(b)(6) corporate designee
9  deposition notice?
10     MR. FLANAGAN: Yes, you are.
11 A. Yes, I am.
12 Q. Okay.
13     MR. MARKOWITZ: Let's mark this as I
14 think this is going to be P-1.
15     MR. FLANAGAN: Yeah.
16     (Discussion off the record.)
17     (Defendant's Exhibit 1, Notice to Take
18 Deposition of Banc, Jack & Joe, LLC d/b/a
19 Titilations Go-Go-Bar, was marked for
20 identification.)
21 Q. Do you mind if I call you Banc?
22 A. Not at all.
23 Q. Banc, I'm showing you now what's been
24 marked as D-1 for identification. Please take a
25 moment to look at this document. It's four pages and

25

1  just let me know first if you have ever seen this
2  before.
3  A. I think I have.
4  Q. Okay. Do you consent to testify on
5  behalf of Titilations which I'm now going to say
6  includes Banc, Jack & Joe, LLC and Banc & Jack Pero,
7  Inc.?
8  A. Yes.
9  Q. Okay. Now, please turn to page 4. So
10 I'll represent to you that these are the topics on
11 which we have requested that a corporate designee for
12 the club -- and when I say "the club," I'm now going
13 to be referring to Banc, Jack & Joe, LLC and Banc &
14 Jack Pero, Inc. Okay? These are the topics which we
15 have requested somebody from the club appear and
16 represent the corporation.
17     Now, number one says, "A person with
18 knowledge of all human resources, policies, practices
19 and procedures, disseminated or communicated to
20 Titilations employees during the time period." And
21 I'll represent to you that the time period is defined
22 as May 31, 2014, to the present.
23     Do you see that, number one?
24 A. I see number one. I don't understand
25 where the time period comes from.

**Page 30**

1  Billy?
2  A. No.
3  Q. Let me just go back for a second talk
4  about the operations for a moment. What is Jack's
5  role and responsibilities as it relates to the club?
6  A. None.
7  Q. He just owns an interest in the club?
8  A. For the most part.
9  Q. How often would you say he stops by?
10 A. Once every two, three weeks.
11 Q. Okay. And what does he do when he
12 comes in?
13 A. I call my brother down to the place to
14 do physical repairs.
15 Q. Okay. He's your contractor?
16 A. He's my brother but he's handy.
17 Q. Okay. And what about Joe?
18 A. Joe is a completely silent partner.
19 Q. Okay. How often would you say he comes
20 to the club?
21 A. Never.
22 Q. Okay. And when it came to putting up
23 the 225K to buy the business, not the building, did
24 all three of you split that evenly?
25 A. We did.

**Page 31**

1  Q. And when it came to putting up the 275K
2  for the building, did the three of you split that
3  evenly?
4  A. It didn't work like that. We took out
5  a loan.
6  Q. Okay. And whose name was on the loan?
7  A. Mine, Jack's and Joe's.
8  Q. And how did the loan get paid back or
9  how does the loan get paid back?
10 A. It's existing.
11 Q. Is it paid back from receipts from the
12 club?
13 A. I guess so.
14 Q. What I'm more asking is -- let me put
15 it this way: Do you get a check every month from Joe
16 to put towards the loan?
17 A. No.
18 Q. Do you get a check from Jack every
19 month to put towards the loan?
20 A. No.
21 Q. Okay. So when the loan payment is due,
22 how is it paid?
23 A. From Banc, Jack & Joe -- excuse me.
24 Scratch that. From Banc & Jack Pero, Incorporated,
25 Titilations.

**Page 32**

1  Q. Okay. Do you know how much the monthly
2  loan payment is?
3  A. It's in the area of $4,000, not
4  including taxes.
5  Q. And since taking out the original loan,
6  have you ever refinanced that loan?
7  A. Two times.
8  Q. Okay. And is the -- was the principal
9  amount the same each time?
10 A. No.
11 Q. The first time you refinanced, did the
12 principal amount go up or down?
13 A. It went up.
14 Q. And what was it the first time you
15 refinanced it?
16 A. Guessing, in the area of a half million
17 dollars.
18 Q. And why did you take out more financing
19 that second time?
20 A. I think we needed money to do repairs
21 and buy equipment.
22 Q. Okay. And the second time you
23 refinanced, did the loan principal amount go up or
24 down?
25 A. It was down.

**Page 33**

1  Q. Okay. And do you remember what it was
2  the second time?
3  A. I don't. It was down due to -- it was
4  just a refinancing of the same loan because the time
5  period came up.
6  Q. Okay.
7  A. So the principal was smaller.
8  Q. Because you had been paying it?
9  A. Yes.
10 Q. Okay. Do you have any idea what the
11 principal amount owed now is?
12 A. I think it's 440 or 430,000.
13 Q. Okay. How would you describe the
14 business of Titilations?
15 A. Can you be more clear with that
16 question?
17 Q. Sure. What type of bar is Titilations?
18 A. Okay. We are a combination gentleman's
19 club, sports bar and cigar lounge.
20 Q. Okay. Has it always been a combination
21 gentleman's club, sport bar and cigar lounge?
22 A. No, the cigar lounge was added about 12
23 years ago and that's approximate.
24 Q. And when you say gentleman's club, what
25 do you mean?

**Page 34**

1    A.   We have dancers for entertainment and a
2  stage and guys come in to watch either sports or
3  watch dancers and interact.
4    Q.   Okay.  Do you know why you're being
5  sued in this case?
6    A.   I do.
7    Q.   And what is your understanding of why
8  you're being sued in this case?
9    A.   Can you rephrase that?
10   Q.   So, what do you think this -- let me
11 think about a good way to phrase it.
12        Do you know why the plaintiff -- that's
13 a good question.  Real good question.  You're
14 stumping me.
15        What's your understanding of what this
16 lawsuit is about?
17   A.   I think this is a fraudulent money
18 grab.
19   Q.   Okay.  Why do you say that?
20   A.   Because she's lying.  She did not work
21 for me when she said she did and I think it's a
22 fraudulent money grab and that's why I say it.
23   Q.   Okay.  Do you know what the legal bases
24 are for the lawsuit?
25   A.   I've become somewhat aware, yes.

**Page 35**

1    Q.   And what's your understanding?
2    A.   It's a little complicated for me, but I
3  believe the plaintiff is saying that she was supposed
4  to be on the books instead of being an independent
5  contractor which I rate her as, and that there are
6  legal requirements to employees that are on the books
7  as compared to independent contractors.
8    Q.   Okay.  Okay.
9         (Defendant's Exhibit 2, Complaint and
10        Jury Demand, was marked for identification.)
11        THE WITNESS:  For the record --
12        MR. FLANAGAN:  There is no question.
13        THE WITNESS:  Okay.  Okay.
14   Q.   All right.  Banc, take a look at what's
15 been marked D-2.  I'll represent to you that this is
16 the complaint in this action.  It's a 25-ish page
17 document.
18        Just tell me if you've seen this
19 before.
20   A.   I believe I have.  I saw so many papers
21 that -- but I think I've seen this.  I'm pretty sure
22 I have.
23   Q.   Okay.  All right.
24        (Defendant's Exhibit 3, Defendants'
25        Answer to Plaintiffs' Complaint with

**Page 36**

1         Affirmative Defenses, was marked for
2         identification.)
3    Q.   All right.  Banc, I'm now showing you
4  what's been marked D-3, and I'll represent to you
5  that this is the defendants' answer to the complaint.
6  Just flip through it and let me know if you have ever
7  seen this document before.
8    A.   Yes.
9    Q.   Okay.
10        MR. MARKOWITZ:  And, lastly, let's do
11 the rog answers.  This will be D-4.
12        (Defendant's Exhibit 4, Defendant Banc
13        Jack & Joe, LLC's Responses to Plaintiff's
14        First Set of Interrogatories, was marked for
15        identification.)
16   Q.   I'm showing you now, Banc, what's been
17 marked D-4.  I'll represent to you this is the
18 Defendant Banc, Jack & Joe, LLC's responses to our
19 interrogatories.  Just let me know if you've seen
20 this before.
21   A.   I think I have but --
22   Q.   Flip to the last page for me.
23   A.   Yeah, I'm sure I must have.
24   Q.   Yeah.
25   A.   Yeah.

**Page 37**

1    Q.   So is this your signature on the last
2  page?
3    A.   Yes, it is.
4    Q.   Okay.  And did you provide information
5  that was used to answer these interrogatories?
6    A.   Yes, I did.
7    Q.   Okay.  All right.  That's all we need
8  there.
9         MR. MARKOWITZ:  This will be D-5.
10        (Defendant's Exhibit 5, Dancer
11        Information and Rules, Bates stamped D 000009
12        through 11, was marked for identification.)
13   Q.   I apologize for flooding you with
14 documents, but I'm showing you now what's been marked
15 D-5.  And for the record this is Bates stamped D
16 000009 to D 000011.
17        Have you ever seen this document
18 before?
19   A.   Yes, I have.
20   Q.   Okay.  And what is this?
21   A.   This is my dancer information and rules
22 documents.
23   Q.   Okay.
24   A.   Also things you shouldn't do if you
25 want to continue to work in my place, and some good

38

1  advice if you do.
2      Q.    And are these policies and procedures
3  and rules for the dancers?
4      A.    Yes, they are.
5      Q.    Okay.  And do you know how long these
6  particular rules on D-5 have been in effect?
7      A.    A minimum of 15 years.
8      Q.    Okay.  And do these rules apply to all
9  dancers?
10     A.    Yes, they do.
11     Q.    Do you know who typed this up?
12     A.    I did.
13     Q.    And were you the only one who was
14 responsible for giving info that is contained in
15 here?
16     A.    My brother probably had input.
17     Q.    Okay.  And is D-5 posted anywhere at
18 Titilations?
19     A.    Yes, it is.
20     Q.    Where is this posted?
21     A.    It's posted right in the hallway for
22 the dancers to see.
23     Q.    And which hallway is that?
24     A.    The -- there is a hallway right off the
25 main bar where the dancers go to their changing room.

39

1  It's in there.
2      Q.    And are dancers ever given this as a
3  piece of paper?
4      A.    Every single one.
5      Q.    Okay.  And when are they given that?
6      A.    The day they are hired.
7      Q.    Okay.  Has this D-5 been changed at all
8  in the last 15 years?
9      A.    Yes, it's been adjusted.
10     Q.    How often would you say it's adjusted?
11     A.    Not very often.
12     Q.    Okay.  Do you remember the last time it
13 was adjusted?
14     A.    Yeah, a couple years ago I added the
15 Some Good Advice column.
16     Q.    And that's the last page you're talking
17 about?
18     A.    Yeah, the last page.
19     Q.    Okay.  And is this dancer info and
20 rules kept on a computer somewhere at Titilations?
21     A.    Oh, yes.
22     Q.    And it's in like a Microsoft Word
23 document?
24     A.    Or whatever the MacIntosh is, yes.
25     Q.    And what folder on the MacIntosh is

40

1  this?
2      A.    It would be under dancer and then
3  subfolder dancer rules.
4      Q.    Is there anything else in that
5  subfolder?
6      A.    Yes.
7      Q.    What else is in that folder?
8      A.    Everything that pertains to the dancers
9  and the dancer rules.
10     Q.    Okay.  All right.  Where is D-5 printed
11 to give it to the dancers?
12     A.    In my office.
13     Q.    You have a printer in your office?
14     A.    I do.
15     Q.    And is it a color printer?
16     A.    Yes, it is.
17     Q.    All right.  How many computers are
18 on-site?
19     A.    I have one.
20     Q.    And is that one computer that you're
21 talking about the only computer where dancer info and
22 rules, policies, procedures are typed up?
23     A.    Yes, it is.
24     Q.    Okay.  You said these rules have been
25 in effect for about 15 years, correct?

41

1      A.    No.
2      Q.    No?
3      A.    I think I said the last time I did an
4  adjustment or a major adjustment was about 15 years
5  ago at least.  There have been dancer rules in effect
6  since the day we opened.
7      Q.    Okay.  I'm more wondering, were these
8  originally typed up on the MacIntosh you have today
9  at Titilations?
10     A.    No, I have had four or five MacIntoshes
11 in the time.  Maybe more.
12     Q.    And with each time that you changed
13 computers, did you move over all your files onto the
14 new computer?
15     A.    Yes.
16     Q.    Okay.  So is it fair to say that on the
17 new MacIntosh, the only computer you have at
18 Titilations, it has all the files from the time you
19 kept keeping computer records?
20     A.    I don't think they save if you delete
21 them.
22     Q.    Okay.  Have you deleted any files?
23     A.    Constantly.
24     Q.    Okay.  We'll come back to D-5.  Tis
25 will be D-6.

42

1  (Defendant's Exhibit 6, document Bates
2  stamped P 00003 to 00016, was marked for
3  identification.)
4  Q.  All right.  Banc, I'm showing you
5  what's been marked, D-6 and I'll represent to you
6  that D-6 is Bates stamped P 00003 and that's all the
7  way through P 00016.  Take a look at these for me.
8  A.  I'm aware of them.
9  Q.  Have you seen these particular pictures
10 before?
11 A.  These particular pictures or what's in
12 the pictures?
13 Q.  How about what's in the pictures?
14 A.  Absolutely.
15 Q.  So let's go picture by picture.  I'm
16 not going to go into depth on them right now.  We'll
17 come back to it.  So let's go to the first page, P
18 00003.  Okay?  These signs that are displayed here,
19 did you type up these posters?
20 A.  I did.
21 Q.  And did you post these posters?
22 A.  I did.
23 Q.  And do these constitute rules and
24 policies that are in effect at Titilations?
25 A.  Yes, they are.

43

1  Q.  Let's go to P 00004.  There's just one
2  sign in here.  Did you type up this sign?
3  A.  I did.
4  Q.  And is this a policy, procedure or rule
5  that's in effect at Titilations?
6  A.  Yes, it is.
7  Q.  Okay.  And let me just go to the first
8  one for a second.  Do you know how long these
9  particular rules have been in effect?
10 A.  A long time but I can't be exactly
11 sure.
12 Q.  Okay.  And the second page, do you know
13 how long this has been in effect?
14 A.  I think I put that one up about three
15 years ago.
16 Q.  Okay.  And, sorry, going back to the
17 first page.  I apologize.  Do these rules, policies

44

1  -- did you type up these signs?
2  A.  Yes, I have.  Yes, I did.
3  Q.  Okay, sorry.  And did you post these
4  signs?
5  A.  Yes, I did.
6  Q.  And do these signs represent, policies,
7  procedures and rules that are in effect at
8  Titilations?
9  A.  Yes.
10 Q.  And how long have these policies, rules
11 and procedures been in effect at Titilations?
12 A.  Years.
13 Q.  Okay.  And do they apply to all the
14 dancers?
15 A.  Yes, they do.
16 Q.  Okay.  Next page is P 00006.  Now, let
17 me just ask you, do these signs, did you type up
18 these signs?
19 A.  Yes, I did.
20 Q.  Okay.  And did you post these signs?
21 A.  Yes, I did.
22 Q.  And are these -- and in your view, what
23 message are you trying to convey on P 00006?
24 A.  That I operate a clean bar.
25 Q.  Okay.  P 00007, did you type up these

45

1  signs?
2  A.  Yes, I did.
3  Q.  How long have these signs been up?
4  A.  Years.
5  Q.  Okay.  And, again, what message are you
6  trying to convey with these signs?
7  A.  That we have rules that the dancers
8  have to follow and if they don't, they will be asked
9  to leave or not given new bookings.
10 Q.  Okay.  P 00008, I ask you just the same
11 questions.  On the left-hand side you see rules which
12 I think we've seen before but just to confirm, did
13 you type these up?
14 A.  Yes.
15 Q.  Did you post these?
16 A.  Yes.
17 Q.  How long have they been in effect?

Page 46

1  Q. Okay. On the left-hand side, do these
2  rules apply to all the dancers?
3  A. Yes, they do.
4  Q. Okay. P 00009, did you write this?
5  A. I did.
6  Q. Okay. Is there any reason you didn't
7  type this one?
8  A. I wanted it bigger and I just thought
9  it would be better with Magic Marker.
10 Q. And did you put this up?
11 A. Oh, yes.
12 Q. And is this a rule, policy and
13 procedure that's been in effect at Titilations?
14 A. Yes.
15 Q. And how long has it been in effect?
16 A. Forever.
17 Q. Okay. And does this apply to all the
18 dancers?
19 A. Yes, it does.
20 Q. Okay. P 00010, so on the left -- well,
21 strike that.
22    Did you write or type all the signs in
23 this picture?
24 A. I did.
25 Q. And did you post all the signs in this

Page 47

1  picture?
2  A. I did.
3  Q. And are these rules, policies and
4  procedures that are in effect at Titilations?
5    MR. FLANAGAN: I'm just going to object
6  and I realize that I should have been objecting to
7  the form of the other questions. I'm just objecting
8  to the form of the question.
9    MR. MARKOWITZ: Okay. Okay.
10 Q. Are these policies, rules and
11 procedures that are in effect at Titilations?
12 A. Yes.
13 Q. And how long have these rules, policies
14 and procedures been in effect?
15 A. Long time.
16 Q. Okay. P 00011, did you type up these
17 signs?
18 A. Yes.
19 Q. And did you post these signs?
20 A. Yes.
21 Q. And how long have these signs been up?
22 A. Various amount of times.
23 Q. Okay.
24 A. They could be three different times for
25 three different signs like this.

Page 48

1  Q. Okay. And what message, again, are you
2  trying to convey with these signs?
3  A. That I run a clean club and if you
4  can't operate in my club clean, you're not welcome.
5  Q. Okay. P 00012, did you type up these
6  signs?
7  A. Yes.
8  Q. And did you post these signs?
9  A. I did.
10 Q. And are these signs rules, policies and
11 procedures that are in effect at Titilations?
12 A. They are.
13    MR. FLANAGAN: I'm just going to object
14 to the form and it's just a standing objection so we
15 don't have to keep interrupting.
16    MR. MARKOWITZ: Okay. Fair enough.
17 Q. And how long have these rules, policies
18 and procedures been in effect?
19 A. You know, they're all different. But
20 likes, for instance, this one that we're looking at
21 right here, was more recent. I saw a need for the
22 girls to bring better outfits. So it's basically a
23 suggestion not a rule in case, you know, on that one.
24 Q. Okay. And does this sign apply to all
25 the dancers?

Page 49

1  A. Yes, it does.
2  Q. Okay. All right. P 00013, now, I'll
3  just differentiate here. So there is three signs
4  that look like they're typed on the top. Did you
5  type those?
6  A. I did.
7  Q. Did you post those?
8  A. I did.
9  Q. Okay. And are those rules, policies
10 and procedures that are in effect at Titilations?
11 A. They are.
12 Q. And how long have those been in effect?
13 A. Quite a while.
14 Q. Okay. And do they apply to all the
15 dancers?
16 A. They do.
17 Q. Now, I see down in the middle of the
18 page there is a little piece of paper that says
19 "Dancer Rules" on top.
20 A. Yep.
21 Q. Did you type that up?
22 A. Yep.
23 Q. And how long has that been up?
24 A. That looks like a long time. That's
25 old.

50
1    Q.   Okay. And does that apply to all the
2 dancers?
3    A.   Yes.
4    Q.   Okay. And is that in effect at
5 Titilations now?
6    A.   It's hard to see even with my glasses,
7 but if it's one of my rules, yes.
8    Q.   Okay. And then P 00014, I'll just
9 represent is a close-up of the previous picture we
10 talked about, so I won't abuse you by going through
11 that.
12        The second to last one, P 00015, this
13 looks like a picture of shoes. Do you know what this
14 is?
15   A.   Yeah, we have people that come to the
16 club that sell clothing items to the dancers, whether
17 it be outfits or shoes, and I guess they put these
18 up, you know, for examples, et cetera.
19   Q.   And do you know who in particular comes
20 to the club to sell this stuff?
21   A.   I don't really pay attention. I know
22 one girl Nicole, I don't know her last name, but
23 there are two or three that rotate. It's kind of
24 something that goes around to different clubs.
25   Q.   Do they sell anything but shoes?

51
1    A.   Outfits.
2    Q.   Okay. And does the club -- is there
3 any kind of business relationship between you and the
4 people that sell this stuff?
5    A.   None.
6    Q.   So if they sell something, they don't
7 give money back to the club?
8    A.   They do not.
9    Q.   Okay. All right. Last one, P 00016.
10 Did you type this poster up?
11   A.   I did.
12   Q.   Did you post it up?
13   A.   I did.
14   Q.   And is this -- are these rules in
15 effect at Titilations?
16   A.   They are.
17   Q.   And how long have they been in effect?
18   A.   Right there it says on top, "This is
19 one small change for 2017." So I would say a year
20 and however many months are here.
21   Q.   And does this apply to all the dancers?
22   A.   Yes, it does.
23   Q.   All right. We'll come back to those,
24 but appreciate that.
25        (Recess taken.)

52
1 BY MR. MARKOWITZ:
2    Q.   All right. Let's just go back to D-6
3 for a moment. These typed up signs that we've gone
4 through that are throughout D-6, are these files that
5 are kept on your computer?
6    A.   Most of them.
7    Q.   And if they aren't kept on your
8 computer, why aren't they kept on the computer?
9    A.   I might have typed this one up here,
10 for example, first page, that is a sign that was
11 obviously written for 2017, that would be thrown in
12 the garbage as well as the file.
13   Q.   Okay. Okay. Meaning when you say
14 "thrown in the garbage as well as the file," meaning
15 you would type this sign up, print it out and then
16 delete the file right away?
17   A.   I might. Or I might leave it there to
18 adjust for another year because that sign is going to
19 be needed again for 2018 and '19. I don't believe I
20 kept that one because I remember typing up -- I mean
21 just putting a piece of sticker like over the number.
22   Q.   Okay. But is there a folder where all
23 the ones that you have kept typed up signs on your
24 computer, where those would be?
25   A.   Yes.

53
1    Q.   Okay. And what folder is that?
2    A.   It's under dancers.
3    Q.   Okay.
4    A.   Or dancer rules.
5    Q.   Okay. And are there signs -- we've
6 gone through the dancer rules which is D-5 and we've
7 gone through D-6. Can you think of any signs that we
8 missed?
9    A.   I mean, it's hard to say but it looks
10 pretty comprehensive.
11   Q.   Okay. And if we missed any signs,
12 would those be either kept in the computer or are
13 they still posted in Titilations?
14   A.   They would be one or the other or
15 discarded.
16   Q.   Okay. Do you know when the last time
17 you deleted a computer file that had a sign on it
18 was?
19   A.   No. No, I don't.
20   Q.   Okay. All right. Do you have any
21 understanding as to what might make somebody an
22 independent contractor rather than an employee?
23        MR. FLANAGAN: I'm just going to object
24 to the form.
25        You can answer.

**Page 70**

1  stage, behave probable properly, talk to the
2  customers, whether they want to do private dance or
3  have a bite to eat with a customer is fine. Their
4  role is to come to work, do their job, make the
5  customers happy, spend time with them, get their tips
6  and go home. It's a fairly simple process.
7      Q.  Are there any written contracts between
8  Titilations and the dancer?
9      A.  Only just this. I mean, just this
10 thing here and the fact that we give every dancer
11 this. It's not signed by them and it's not signed by
12 us, but it is a document that is given from us to
13 them.
14     Q.  Okay. So let me just unpack that a
15 little bit.
16     A.  That's the dancer info and rules.
17     Q.  That's the document that you said is
18 given to every dancer. You're referring to what I
19 think is D --
20         MR. FLANAGAN: D-5.
21     Q.  D-5.
22     A.  Sorry. D-5.
23     Q.  And prior to that you were referring to
24 the dancer application in D-7?
25     A.  Yes. Correct.

**Page 71**

1      Q.  Okay. There is no other written
2  agreements between the dancer and Titilations?
3      A.  There are not.
4      Q.  Okay. What about between Titilations
5  and the DJs, are there any written agreements?
6      A.  Well, no written agreements.
7      Q.  Okay. What about between the
8  Titilations and bartenders, are there any written
9  agreements?
10     A.  There are not.
11     Q.  What about between Titilations and the
12 kitchen staff, are there any written agreements?
13     A.  There are not.
14     Q.  Okay. Are there any verbal agreements
15 between the club and Titilations?
16     A.  That's the same thing.
17     Q.  Well, before I was asking about it
18 written.
19     A.  You said "club and Titilations".
20     Q.  I'm sorry. Are there any verbal
21 agreements between the club and the dancers?
22     A.  That's a hard question for me to
23 answer. They agree to follow our rules; we agree to
24 let them come to work.
25     Q.  Okay. Okay. That's fair. What

**Page 72**

1  employees -- bad question.
2      How many different types of jobs are
3  filled at Titilations during any one shift?
4      A.  Bartender.
5      Q.  Okay.
6      A.  Manager. DJ. Sometimes security.
7  Kitchen staff. Sometimes barback.
8      Q.  Did you mention bartenders?
9      A.  I think that was first, but if not,
10 yes.
11     Q.  Okay. So let me see if I can go
12 through it so we are both on the same page.
13 Barbacks, yes?
14     A.  Yes.
15     Q.  Bartenders?
16     A.  Yes.
17     Q.  DJs?
18     A.  Yes.
19     Q.  Managers?
20     A.  Yes.
21     Q.  Kitchen staff?
22     A.  Yes.
23     Q.  Dancers?
24     A.  No.
25     Q.  No?

**Page 73**

1      A.  Dancer are not employees.
2      Q.  Okay, fair. When you say dancers are
3  not employees, are the other categories of staff that
4  we mentioned, are they employees?
5      A.  Absolutely.
6      Q.  Okay. So the DJ is an employee?
7      A.  Yes.
8      Q.  The managers are employees?
9      A.  Yes.
10     Q.  The kitchen staff are employees?
11     A.  Yes.
12     Q.  The barbacks are employees?
13     A.  Yes.
14     Q.  The bartenders are employees?
15     A.  Yes.
16     Q.  And what about the occasional security?
17     A.  Yes.
18     Q.  Do you have waitresses?
19     A.  I do not.
20     Q.  The categories of employees we just
21 mentioned excluding dancers, are they paid via
22 paycheck?
23     A.  Yes, they are.
24     Q.  Okay. I'm sorry, I have to go through
25 each one. The barbacks get a paycheck?

74

1   A.   Yes.
2   Q.   The bartenders get a paycheck?
3   A.   Yes, and tips.
4   Q.   Security gets a paycheck?
5   A.   Yes.
6   Q.   The DJ gets a paycheck?
7   A.   And tips.
8   Q.   Kitchen staff gets a paycheck?
9   A.   Yes.
10  Q.   Do all of those categories of employees
11  make minimum wage or more?
12  A.   More.
13       MR. FLANAGAN: I'm just going to object
14  to the form.
15  Q.   Do all those categories of employees
16  make at least the minimum wage?
17  A.   I would assume.
18  Q.   Okay. But you have payroll records
19  that reflect that?
20  A.   Yes, absolutely.
21  Q.   Okay. Okay. Once a dancer is hired,
22  meaning approved by you, are there hours tracked with
23  a time sheet, time clock or anything like that?
24  A.   Not necessarily.
25  Q.   Okay. When you say not necessarily,

75

1   what do you mean?
2   A.   Nobody punches in or punches out as a
3   dancer.
4   Q.   Is there a time clock at Titilations?
5   A.   There is not.
6   Q.   Does Titilations compensate the dancer
7   in any way?
8   A.   None.
9   Q.   Does Titilations pay the minimum wage
10  to dancer?
11  A.   No.
12  Q.   Has Titilations ever paid the minimum
13  wage to dancer?
14  A.   Dancer got paid by the shift 20-plus
15  years ago for a short time. That ended.
16  Q.   While you owned the club, there was a
17  time that dancers got paid by the shift?
18  A.   Yes.
19  Q.   And for about how long did that --
20  A.   Two years.
21  Q.   Two years?
22  A.   Approximately.
23  Q.   And do you remember why it changed?
24  A.   I don't. I think it was just a
25  practice that had gone on for years and ended.

76

1   Q.   Do you remember what they got paid per
2   shift?
3   A.   Dancers were different. It was
4   considered an appearance fee. Like a girl would say,
5   If you want me to come to your club, you're going to
6   pay me X amount of dollars to dance. And other girls
7   would say different numbers. Some girls didn't get
8   paid at all. It was not an across-the-board thing.
9   Q.   Okay. So is it fair to say, though,
10  that for at least 20 years, Titilations has not paid
11  the minimum wage to dancer?
12  A.   That's fair to say.
13  Q.   And it's fair to say that for 20 years,
14  Titilations has not compensated dancers in any way?
15  A.   That's fair to say.
16  Q.   So for dancers there is no record of
17  the time they actually worked, correct?
18  A.   That's inaccurate.
19  Q.   Okay.
20  A.   There is a record of the time they're
21  supposed to work. Okay? It's online in files. That
22  doesn't mean that the dancer came to work. A dancer
23  may or may not show up. Even though her name might
24  be in the file as supposed to work or in the book,
25  it's not a 100 percent thing.

77

1   Q.   Okay. So there's an online schedule?
2   A.   Yes.
3   Q.   And that is more of a goal than
4   anything, right? And what I mean by that -- I'm
5   sorry, I'll be more clear. The schedule is set ahead
6   of time and whether or not a dancer shows up would
7   not be reflected on the online schedule?
8   A.   Correct.
9   Q.   Okay. So there are instances where a
10  dancer's name will appear on the schedule online for
11  a certain shift but that she may not have shown up?
12  A.   Correct.
13  Q.   Okay. And is there any record at the
14  club of whether a dancer actually shows up?
15  A.   No.
16  Q.   So is it fair to say that if a dancer
17  is on the schedule but doesn't show up, there is no
18  record of that anywhere?
19  A.   There will be a record kept for a very
20  short time.
21  Q.   Okay. Can you explain that to me?
22  A.   Yes. If a dancer doesn't show up, then
23  everybody in the club is going to know she didn't
24  show up because it will be written down on the wall.
25  And if the dancer doesn't show up again, she will

Page 78

1  never work for us again. So there is no reason to
2  keep a record.
3      Q.    Okay. When you say, "written up on the
4  wall," what exactly do you mean?
5      A.    You saw the pieces of paper on, I think
6  it was D-6. If you look on page P 00007 you will see
7  the name Bella. And then you will see on the right
8  the name Gisselle. It shows why the dancer was
9  fired. In the case of Bella, she did not show up
10 twice, therefore she doesn't work for us anymore. In
11 the case of Gisselle, she was not confirmed the first
12 time with a no show, not confirmed the second time
13 and then a no show the third time. She was fired or
14 should I say not allowed to work again.
15     Q.    Got it. Got it. So when you say
16 written on the wall, there is this --
17     A.    This is in the office before it gets
18 put on the piece of paper.
19     Q.    These tickets, let's call them?
20     A.    Yes. Yes.
21     Q.    And they're orange?
22     A.    Or blue.
23     Q.    Orange or blue. Is there any
24 difference in meaning between orange or blue tickets?
25     A.    No, just how they came on paper.

Page 79

1      Q.    Okay. And right now we're looking at
2  P 00007, correct?
3      A.    Yes.
4      Q.    Okay. So is it fair to say, also, then
5  that when a dancer shows up for her shift, she
6  doesn't check in?
7      A.    She does check in.
8      Q.    Okay. How does she check in?
9      A.    She walks up to the DJ and says, "I'm
10 here for my shift."
11     Q.    She doesn't sign anything?
12     A.    No.
13     Q.    Okay. And why is it that Titilations
14 doesn't track actual hours worked by the dancer?
15     A.    Because it's an ongoing daily operation
16 that we know if a dancer is on time, does her full
17 shift and goes home without a problem.
18     Q.    Okay. Has Titilations ever tracked
19 hours actually worked why dancers?
20     A.    No.
21     Q.    Never?
22     A.    Never.
23     Q.    Okay. Can you tell me why Titilations
24 doesn't pay the minimum wage to dancer?
25     A.    Dancers are not employees.

Page 80

1      Q.    You said earlier they're independent
2  contractors?
3      A.    I believe they're independent
4  contractors.
5      Q.    And they are contractors who contract
6  with the club, is that fair to say, in your opinion?
7      A.    I'm not sure what that means.
8      Q.    Okay. You gave us the example earlier
9  of a landscaper. Is it safe to say that a landscaper
10 who comes to Banc's house is contracting with Banc to
11 do work there?
12     A.    If -- I'm not sure what the word
13 contracting means. I don't want to make a mistake
14 and say contracting is the wrong or right word. If
15 you could be more clear, I would be more than happy
16 to answer it.
17     Q.    In the landscaper example, the
18 landscaper is agreeing to do work for Banc at Banc's
19 house; is that fair to say?
20     A.    That seems fine.
21     Q.    And is it also fair to say then that a
22 dancer is agreeing to do work at Titilations?
23     A.    Yes.
24     Q.    Okay. And just like Banc might have
25 rules for landscaping, don't kill my hydrangeas,

Page 81

1  Titilations has routes for its dancers; is that fair
2  to say?
3      A.    Yes.
4           MR. FLANAGAN: Can we just take another
5  quick break?
6           MR. MARKOWITZ: Sure.
7           (Recess taken.)
8  BY MR. MARKOWITZ:
9      Q.    All right. Back on the record.
10          Is it correct to say that a dancer's
11 compensation comes solely from tips she gets from
12 customers of Titilations?
13     A.    All the money from a dancer -- for a
14 dancer comes from the customers, yes.
15     Q.    Okay. How many new dancers would you
16 say are hired per month?
17     A.    There is no number. It could be one,
18 it could be 10.
19     Q.    And the only way to track that would be
20 looking at all these application sheets that we've
21 seen today?
22     A.    That would be an indication but not
23 exactly because dancers come and go. So the hires,
24 yes, but if I didn't keep the sheet because they just
25 left, we wouldn't have that information.

94

1  year?
2      A.   Correct.
3      Q.   And then when do you get rid of the
4  calendar for any particular year?
5      A.   Well, at the end of the year we get rid
6  of it but at the end of the week I throw it away.
7      Q.   Okay.  Explain that to me.
8      A.   The week of sheets gets tossed.
9      Q.   Okay.  So you have a planner for the
10 whole year but every week you rip out whatever week
11 had passed and throw it away?
12     A.   Exactly.
13     Q.   And so how long have you had that
14 practice of doing that?
15     A.   As long as I've had a day planner;
16 decades.
17     Q.   Okay.  And is the day planner the only
18 record that you would keep of the schedules besides
19 the online schedule?
20     A.   Yes.
21     Q.   However, is it fair to say that the
22 written planner doesn't always match the online
23 planner?
24     A.   Correct.
25     Q.   Because dancers reschedule, they get

95

1  fired, they leave or whatever?
2      A.   Correct.
3      Q.   Okay.  Let me just refer to D-8 one
4  more time.  Sorry.
5           Do you know whose handwriting is in
6  here?
7      A.   Everybody that works as a manager.
8      Q.   So the managers fill this out?
9      A.   They do.
10     Q.   And how do you differentiate between
11 which managers fill out which weeks?
12     A.   No, it doesn't work like that.
13     Q.   How does it work?
14     A.   William Kulesza is -- for the most part
15 does the bookings in advance.  We get the booking
16 November.  He'll start doing bookings for the first
17 four-month block in 2019 but since the thing changes
18 on a daily basis, whatever manager is in the office
19 at that time will white somebody out and fill
20 somebody in.  So it's not -- it doesn't matter what
21 manager does it, it just gets done on an ongoing
22 basis.
23     Q.   And just to recap, you don't have
24 any -- strike that.
25          The day planner, though, will only

96

1  reflect the shifts that are scheduled, not the actual
2  shifts that are worked, correct?
3      A.   Correct.
4      Q.   What are the shifts for dancers?
5      A.   We have a variety.  On Monday, Tuesday
6  and Wednesday the dancer shifts goes from 3 until 7
7  or 8.  We give the girls the options if she wants to
8  stay for the extra hour or not.  And then the night
9  shift on Monday, Tuesday, Wednesday starts between 7
10 and 7:30 depending on the overlap.
11          On the other four days, Thursday,
12 Friday, Saturday, Sunday, it's very similar except we
13 have a noon shift.  So the girls will come in for the
14 noon shift, work until five or six.  Generally a
15 dancer will work five to six shifts.  Six is the
16 average.  And then the 3:00 shift will come in and
17 work from 3 until 7 or 8.  And then the 7, 7:30 shift
18 will come in until the night's closing.
19     Q.   Okay.  Who determined those shifts?
20     A.   The dancer and the manager.
21     Q.   Let me ask it a different way.  Who
22 originally set those time periods as the shifts?
23     A.   That's been organic and that changed
24 over the years.  It's probably been the same for 15
25 years now.

97

1      Q.   And who originally 15 years ago came up
2  with those shifts?
3      A.   The whole thing is me.
4      Q.   Okay.  And how did you come up with
5  those shift times?
6      A.   Just from what seemed like normal
7  practice in the industry from what other places did
8  and what I thought was best for the club.
9      Q.   And how many different dancers work in
10 a particular shift?
11     A.   Okay.  There's a variety.
12     Q.   Okay.
13     A.   Generally the early shifts, the ones
14 that start in noon or start at 3 have seven, eight or
15 nine dancers.
16     Q.   Okay.
17     A.   The night shift has between 17 or 20,
18 depending on the day or, say, Friday, the busy day.
19     Q.   Okay.  Can a dancer make up her own
20 shift?
21     A.   Well, she does.
22     Q.   Let me be more clear.  Can a dancer
23 work -- okay.  So Monday, Tuesday, Wednesday, there
24 is a 3 to 7 or 8:00 shift and then there is a 7 to
25 what again?

Page 98

```
 1    A.    2 a.m.
 2    Q.    7 to 2 a.m.  Can a dancer on Monday or
 3  Tuesday, Wednesday choose to come at five and leave
 4  at nine?
 5    A.    No.
 6    Q.    So a dancer can't -- let me think of a
 7  better way to ask this.
 8          It's fair to say that a dancer cannot
 9  determine her own shift length or time, she has to
10  pick one of the shifts that you have set?
11    A.    Correct.
12    Q.    Okay.  And I know you said that there
13  are seven, eight or nine dancers per shift?
14    A.    Yes.
15    Q.    Who sets that amount?
16    A.    I'm the final say person on that.
17    Q.    And why did you end up coming up with
18  seven to nine dancers per shift?
19    A.    Well, it's not as busy on Monday
20  afternoon as it is on Friday afternoon.  So you put
21  on more dancers to accommodate more customers.
22    Q.    So it's based upon volume of the
23  customers in the business?
24    A.    Or expected volume.
25    Q.    Or expected volume.  Okay.  Are there
```

Page 99

```
 1  shifts that are more preferential from a dancer
 2  perspective?
 3    A.    Many dancers have different shifts they
 4  prefer.  So overall I would assume busier shifts but
 5  that's not necessarily the case.
 6    Q.    And with respect to the dancers, the
 7  only overlap there would be is dancers that choose to
 8  work the extra hour on the Monday, Tuesday, Wednesday
 9  shift and the night shift?
10    A.    No.
11    Q.    No.
12    A.    There is almost -- there is
13  automatically an overlap.
14    Q.    Okay.
15    A.    Which is why some dancers don't want to
16  stay as long work the sixth hour for example, and
17  they're allowed to go home.
18    Q.    They don't want to work that last hour
19  you mean?
20    A.    Yeah.  After the night shift comes in,
21  some dancers feel there might be too many dancers
22  there and they choose to leave early instead of being
23  in part of a crowd, so to speak.
24    Q.    Do dancers ever work more than one
25  shift in a day?
```

Page 100

```
 1    A.    It's happened but if it happened ten
 2  times in the last ten years, it would be a shock.
 3    Q.    And is that because you don't want
 4  dancers working more than one shift or is it because
 5  dancers don't want to work more than one shift?
 6    A.    We don't want them working more than
 7  one shift.
 8    Q.    Okay.  Why not?
 9    A.    Because customers like to see different
10  dancers.
11    Q.    So as a general rule, it's not allowed
12  to work more than one shift?
13    A.    It's not a general rule.  It's a
14  hard-and-fast rule.
15    Q.    Okay.  Okay.
16    A.    Yeah.
17    Q.    And I know we sort of went over this,
18  are dancers permitted to come in the middle of a
19  shift?
20    A.    They are not.
21    Q.    Can they leave in the middle of a
22  shift?
23    A.    If they ask.  It happens.
24    Q.    Are they supposed to leave in the
25  middle of a shift?
```

Page 101

```
 1    A.    No.
 2    Q.    Would it only be if there were exigent,
 3  exceptional circumstances that you might let a dancer
 4  leave in the middle of the shift?
 5    A.    Yes and no.  If it's slow and a dancer
 6  said, "It's slow.  Can I leave?", on occasion the
 7  manager may say yes.
 8    Q.    Is it up to the manager on duty to make
 9  that determination?
10    A.    It is.
11    Q.    Are there any mandatory shifts?
12    A.    Are there any mandatory shifts.  Well,
13  yes.  I believe you have to do one Sunday a month if
14  you get your booking.
15    Q.    Why is that?
16    A.    Because dancers don't want to work on
17  Sundays especially in the summertime.  So it's hard
18  to find dancer because they don't come to work on the
19  weekends in the summertime.  It might even be
20  Saturday.  I forget.  My managers take care of it.
21  So there is a thing if you get two bookings a week,
22  you are going to have to work maybe one Saturday a
23  month, maybe one Sunday a month.
24    Q.    Is that written down anywhere?
25    A.    Oh, yes, it is.  I don't know if it's
```

**Page 110**

1  Q. What is it?
2  A. 973-680-4223.
3  Q. And does that number go to a machine?
4  A. Yes, it does.
5  Q. And has that always been the case?
6  A. Always been the case.
7  Q. Okay. What happens if a dancer doesn't
8  call to confirm within 24 hours?
9  A. She gets called up that day and is
10 asked why did you not confirm and then depending on
11 her answer, she will be told you understand that if
12 you don't call up and confirm again, you will not
13 work here anymore.
14 Q. And who is responsible for making that
15 call?
16 A. I am.
17 Q. And who is responsible for checking the
18 voice mails on that machine?
19 A. My managers.
20 Q. And so the managers will check the
21 voice mails, cross-reference that with a list of who
22 is supposed to work and then if anyone hasn't called,
23 you call?
24 A. No.
25 Q. No?

**Page 111**

1  A. I don't call. My managers call.
2  Q. Okay. Okay. So safe to say that the
3  managers check the machine, they look at that in
4  comparison with the list of the scheduled dancers and
5  anyone who hasn't called as of 24 hours, they get a
6  phone call from a manager?
7  A. Or a text.
8  Q. Or a text?
9  A. And not 100 percent of the time.
10 Q. Okay.
11 A. Okay. Almost always but if it's a
12 second time, they will not get a call from the
13 manager because they're not going to be working with
14 us anymore.
15 Q. Got it. It doesn't matter what their
16 excuse is?
17 A. Not interested.
18 Q. Not interested?
19 A. Heard them all.
20 Q. Okay. And if you don't get a
21 satisfactory answer or you know the dancer is not
22 going to come in, is the procedure to call another
23 dancer to fill that shift?
24 A. Generally it's not necessary because we
25 have enough dancers, but if it's early enough and

**Page 112**

1  there was a girl who left her name on the fill-in
2  sheet which we also have in the day planner, they
3  might get a call and say, "Mary, there is an opening
4  at 3:00. Would you like to work?"
5  Q. Okay. Is there a number that dancers
6  can call to cancel their shift?
7  A. Yes.
8  Q. Okay. And what's that number?
9  A. That is the main bar number. That's
10 973-748-3699.
11 Q. And if they want to cancel, they have
12 to do it before 24 hours before their shift starts,
13 correct?
14 A. We definitely prefer that.
15 Q. And if they call and cancel within 24
16 hours, what happens then?
17 A. We're fairly lenient for girls that we
18 know are dependable and are calling for a particular
19 reason that she's not -- she's sick, maybe her baby
20 is sick. We're very reasonable with the girls that
21 work for us.
22 Q. But correct me if I'm wrong, but there
23 have been instances where somebody has called to
24 cancel within 24 hours and they have been
25 disciplined, right?

**Page 113**

1  A. Yes.
2  Q. Okay. How often does that happen?
3  A. We let girls go all the time.
4  Q. Okay. And is it basically just a
5  judgment call whether or not a particular girl gets
6  disciplined for calling in within 24 hours versus
7  getting a pass?
8  A. Yes.
9  Q. Okay. Are dancers themselves permitted
10 to call other dancers and get them to cover their
11 shift?
12 A. They are not.
13 Q. It's safe to say that the club is
14 responsible for getting a dancer to cover a shift if
15 there is a need for that?
16 A. Yes.
17 Q. And nobody else?
18 A. Yes.
19 Q. Right. What if the dancer does not
20 call and does not show up?
21 A. They get one pass.
22 Q. Okay. And if it happens a second time?
23 A. They don't work for us again ever.
24 Q. And those are on those sheets, those
25 tickets that we talked about earlier?

### Page 114

1  A. Yes.
2  Q. That's how you track it?
3  A. Yes.
4  Q. Are there certain days which are more
5  important to confirm or not to cancel than other
6  days?
7  A. No.
8  Q. And would you say that Fridays are the
9  most popular -- strike that.
10     Are Fridays the busiest time at the
11 club?
12  A. Arguably.
13  Q. Okay. And a dancer can't just show up
14 and work on a Friday if they're not scheduled?
15  A. She cannot.
16  Q. Okay. If a dancer did show up on a
17 Friday, she wasn't scheduled, would she be sent home?
18  A. It's never happened.
19  Q. Okay.
20  A. Yeah, it's just understood.
21  Q. Okay. What about managers, do they
22 have to call 24 hours in advance to confirm their
23 shift?
24  A. No.
25  Q. Do managers have to call if they're

### Page 115

1  going to cancel a shift?
2  A. No, the manager will fill this shift in
3  themselves.
4  Q. So a manager is permitted to call
5  somebody and cover their shift?
6  A. Absolutely.
7  Q. What about the DJs, do the DJs have to
8  call 24 hours ahead of time to confirm their shift?
9  A. No. To make it easy, the policy for my
10 manager goes through every one of my employees.
11  Q. Okay. What happens if a manager
12 doesn't cover their own shift or can't?
13  A. Well, they might ask me to cover. This
14 hasn't happened in a minimum of ten years. I have
15 enough managers.
16  Q. Okay. Same thing with DJs?
17  A. Yeah. I've never DJ'ed, but, yeah, we
18 have enough DJs.
19  Q. And so the DJs don't have to call and
20 confirm 24 hours ahead?
21  A. No.
22  Q. Same thing with the bartenders?
23  A. It's understood they're coming to work.
24 They're employees.
25  Q. Right. Okay. Are the bartenders

### Page 116

1  allowed to call and cover their own shifts?
2  A. Yes, they are.
3  Q. Is there a rule or policy about how
4  long before a dancer's shift starts that they have to
5  arrive?
6  A. We have a recommendation of 20 minutes
7  but if they are on stage at their scheduled time,
8  it's not really a problem for us.
9  Q. So has any dancer ever been disciplined
10 for not showing up 20 minutes before their shift?
11  A. No, but -- well, yes. Let me rephrase
12 that. It was getting bad where girls were showing up
13 late. I believe it's in the things, so you'll notice
14 right there where it says dancers --
15  Q. So we're looking at D-6, P 00004.
16  A. Dancers were coming in late after they
17 were supposed to start. That's very annoying as an
18 owner and a manager. So put a sign up, don't come in
19 late and then the dancers were told, if you come in
20 late, the first time you're going to get a warning,
21 the second time you're going to pay $10 to the club
22 and the third time you're going to pay $20 to the
23 club. That sign was not needed again after about a
24 month. People start being coming in on time.
25  Q. Did any dancer ever have to pay the

### Page 117

1  club that fine?
2  A. Yeah, probably a half dozen to a dozen
3  dancers over the month-long period as they were
4  learning that situation.
5  Q. Do you remember when this sign was put
6  up and the fines were imposed?
7  A. It looks like about a year, I'm going
8  to guess. I could be wrong.
9  Q. Okay. But that policy applies to all
10 the dancers?
11  A. Yep.
12  Q. Whose job is it to supervise whether
13 all the policies that we've been talking about are
14 followed?
15  A. The manager on duty.
16  Q. And if he wants to impose discipline,
17 send somebody home or anything like that, does he
18 have to run it by you first?
19  A. He does not.
20  Q. Okay. The scheduling policies that we
21 were talking about with the calling ahead 24 hours,
22 call if you're going to cancel, for dancers, how long
23 have those policies been in place?
24  A. Years and years and years.
25  Q. Okay. And they apply to all the

                                                                    138
1    A.   Ever since we started them.
2    Q.   Which is how long?
3    A.   Probably 12 years.
4    Q.   Okay.  And do you write down the dancer
5  who is doing the champagne dance?
6    A.   Absolutely.
7    Q.   Okay.  Because if it's a credit card,
8  they have to get money from it, right?
9    A.   From us.
10   Q.   Right.
11   A.   Yes.
12   Q.   And how do you pay the dancers out from
13 a champagne dance?
14   A.   Cash.
15   Q.   The same night?
16   A.   Right there, end of the night, end of
17 the shift.
18   Q.   End of the shift.  And the same goes
19 for the bartenders and the house?
20   A.   Correct, but we don't have to pay the
21 house.
22   Q.   You don't have to pay yourself?
23   A.   Right.
24   Q.   And the bartender money, does that go
25 into the pool?

                                                                    139
1    A.   No, because the bartender works alone
2  in the lounge.
3    Q.   And how does any particular bartender
4  get chosen to go up to do a champagne dance?
5    A.   No, no, no.
6    Q.   I'm sorry.
7    A.   It's okay.  It's a separate entity
8  upstairs, not business-wise but we have a downstairs
9  bar and an upstairs bar.  So whatever bartender
10 happens to be working that shift per set shift, she's
11 there.  It has nothing to do with the dancer at all.
12 Nobody might do a champagne dance.  Three dancers
13 might do champagne dances during her shift.
14   Q.   Okay.
15   A.   She just gets the $20 for bringing
16 drinks to that dance or whatever the case maybe.
17   Q.   And the dancer is allowed to collect
18 tips on top of her payout from the champagne dance?
19   A.   Yes.
20   Q.   Okay.  Okay.  Let me just go back to
21 the dress code for a second.  Are the dancers
22 themselves responsible for buying all the clothes
23 that they dance in?
24   A.   Yes, they are.
25   Q.   Okay.  How about the employees that

                                                                    140
1  wear staff shirts, do they have to buy those?
2    A.   I buy the shirts.
3    Q.   The staff shirts?
4    A.   I buy the staff shirts.
5    Q.   All right.  Let's talk about the
6  customers for a second.  What do the customers pay
7  for at the club?
8    A.   Food.
9    Q.   Okay.
10   A.   Beverages.
11   Q.   Okay.
12   A.   Cigars.  And then their discretionary
13 income is up to them.
14   Q.   Is there a cover charge?
15   A.   No.
16   Q.   Never?
17   A.   Never.
18   Q.   What is a house fee?
19   A.   That is the fee the dancers pay per
20 shift to the house.
21   Q.   All dancers?
22   A.   Every dancer.
23   Q.   How much is the house fee?
24   A.   $30.
25   Q.   How long has it been $30?

                                                                    141
1    A.   Long time.  Probably eight, nine years.
2    Q.   And a dancer has to pay a house fee for
3  every shift she works?
4    A.   Shift, yes.
5    Q.   What happens if a dancer does not pay
6  the house fee?
7    A.   She has to pay the house fee.
8    Q.   What happens if she does not?
9    A.   She won't work for us again.
10   Q.   Okay.  Is it possible that a dancer
11 could not pay the house fee on one shift and come
12 back and work and pay two house fees the next time?
13   A.   Oh, it's happened before.
14   Q.   So in a sense a dancer cannot pay the
15 house fee on one shift but then be indebted to the
16 club for the amount of the house fee on her next
17 shift?
18   A.   Let's rephrase that because I'll help
19 you with this one.
20   Q.   Okay.
21   A.   It happens by accident.  It isn't
22 something that is ongoing like I'm not going to pay
23 you today, I'll pay you next time.  Sometimes a
24 dancer will be in a hurry to leave and say, oh, I
25 forgot to pay the house fee, whatever.  And they'll

142
1  generally call up or we will call up, my manager will
2  call up and say, you know, you forgot to pay your
3  house fee and then they'll pay the next time.  It
4  happens like once every two months, whatever.  It's
5  purely an accidental thing.
6       Q.    Nobody ever flat out refuses to pay a
7  house fee?
8       A.    Oh, we've had girls flat out refuse to
9  pay the house fee.
10      Q.    And then what happens?
11      A.    Just not interested in having them
12 back.
13      Q.    And how do you keep track of who pays
14 the house fee or who doesn't?
15      A.    It's everybody.  It's very easy keeping
16 track.  You work, your name is on the list, as soon
17 as you pay, they put an X next to your name.
18      Q.    And do you pay at the beginning or the
19 end of the shift?
20      A.    They can pay whenever they want.
21      Q.    Before they leave the building?
22      A.    Before they leave the building.
23      Q.    If somebody, if a dancer leaves early
24 for whatever reason, does she still have to pay the
25 house fee?

143
1       A.    Yes, she does.
2       Q.    Is there any minimum time that a dancer
3  has to work in order to have to pay the house fee?
4       A.    We don't have a policy for that.  Like,
5  we just don't have a policy for that.  You come for
6  your shift, you pay the house fee.
7       Q.    Okay.  And who collects the house fee
8  money?
9       A.    The manager.
10      Q.    And is it cash?
11      A.    Almost entirely.
12      Q.    Is the dancer allowed to pay the house
13 fee with a credit card?
14      A.    I don't think it's ever happened.
15      Q.    But there is no set policy against
16 paying it with a credit card?
17      A.    I would probably add a credit card
18 charge on there to cover the fee, but, you know what,
19 it's never come up.
20      Q.    And are there any other fees that the
21 dancer have to pay per shift?
22      A.    They have one DJ fee of $15.
23      Q.    Okay.  What happens if they don't pay
24 the DJ?
25      A.    It's the same policy.

144
1       Q.    And the DJ tracks that rather than the
2  manager?
3       A.    Yes.
4       Q.    Why do they have to pay the DJ?
5       A.    That's our house policy.  The DJ plays
6  the music the dancers request all night long and it's
7  really not fair for the DJ who works at a lower pay
8  rate than most people, almost similar to a
9  bartender -- a DJ is essentially a tipped employee
10 and they get their tips from the dancers.
11      Q.    Now, let me ask you this:  During a
12 dancer's set, do they dictate what the music is?
13      A.    They can ask the DJ to play their music
14 and if it fits into our guidelines, essentially
15 they're dictating it.
16      Q.    But at the end of the day the DJ has
17 the discretion of what to play?
18      A.    Yes.
19      Q.    Or to say it differently, the DJ has
20 final say of what music he plays?
21      A.    Yes.
22      Q.    Dancers can request?
23      A.    Yes.
24      Q.    And if there is two dancers dancing at
25 the same time, it's not possible that both of their

145
1  songs get played, correct?
2       A.    Well, it can because they never start
3  at the same time.  So there is always five minutes
4  between a dancer minimum.  So if a dancer goes up and
5  says I want you to play XYZ music for me, she can get
6  that when she starts.  And then as the next dancers
7  goes up, happens.  Not every dancer requests music.
8  Yes, every dancer can get at least one song when they
9  start.
10      Q.    Okay.  Is any of the house fee or the
11 DJ fee distributed back to dancers?
12      A.    No.
13      Q.    Okay.  Does the DJ pay any kind of fee?
14      A.    For?
15      Q.    Anything to the club.
16      A.    No, he's an employee.
17      Q.    And do the waitresses pay any kind of
18 fee?
19      A.    They do not.
20            MR. FLANAGAN:  Bartenders.
21      A.    I knew what you meant.
22      Q.    Bartenders.  Do you know how much the
23 club makes from the house fee every year?
24      A.    Well, you can extrapolate out 180
25 shifts times $30 times 52 weeks and come up with the

182

1  Q. Okay. What do you think the biggest
2  driver of patrons to Titilations is? And what I mean
3  by that, do you think it's your advertising? Do you
4  think it's word of mouth?
5  A. I don't want to speculate on that. I
6  don't know what brings people to my club. There is a
7  variety of reasons.
8  Q. Okay. Do all of the employees or
9  dancers who work for Titilations or at Titilations
10 work in New Jersey?
11 A. You mean solely?
12 Q. No. So -- I'm just -- what I'm trying
13 to get at is, there is no employees or dancers that
14 work for or at Titilations in any other state but New
15 Jersey, right?
16 A. Oh, no. We have just one location,
17 yes.
18 Q. Okay. And I think you said earlier
19 that all of the rules and policies that we went
20 through today apply to all the dancers equally?
21 A. Yes, they do.
22 Q. Okay. Aside from the sign that talks
23 about the distribution of tip pooling for the
24 bartenders, are there any other signs like the ones
25 we've been looking at in D-6 for the DJs, the

183

1  bartenders, the kitchen staff?
2  A. None.
3  Q. None. Okay. Does Titilations have an
4  employee handbook?
5  A. We do not.
6  Q. Have you ever fired a bartender?
7  A. Absolutely.
8  Q. For what?
9  A. Stealing, certainly. Getting drunk too
10 many times. Having a dispute with a customer that
11 was her fault and out-of-hand situations like that.
12 Q. Okay. And are those policies and
13 procedures, don't steal, don't get too drunk, don't
14 have disputes with customers, are those written down
15 anywhere for the bartenders?
16 A. No. They're implied.
17 Q. Okay. Is there anything else that
18 we've talked about today that you want to amend any
19 answers you gave or give me more information about
20 anything we talked about?
21 A. Not that I can think of.
22    MR. MARKOWITZ: I think that's all I
23 have, Pat.
24    MR. FLANAGAN: I don't have anything.
25    (Time noted: 2:27 p.m.)

184

1           CERTIFICATE
2    I, CELESTE A. GALBO, a Certified Court
3  Reporter and Notary Public within and for the State
4  of New Jersey and Registered Professional Reporter,
5  do hereby certify that prior to the commencement of
6  the examination the witness was duly sworn by me.
7    I DO FURTHER CERTIFY that the foregoing is a
8  true and accurate transcription of the testimony as
9  taken stenographically by and before me on the date,
10 time and place aforementioned.
11   I DO FURTHER CERTIFY that I am neither a
12 relative, employee, attorney, nor counsel to any
13 parties involved; that I am neither related to nor
14 employed by any such attorney or counsel; and that I
15 am not financially interested in the outcome of this
16 action.
17   In witness whereof, I have hereunto set my
18 hand this 1st day of December 2018.
19
20
21
22   CELESTE A. GALBO, CCR, RPR, RMR
     License No. 30X100098800
23    My commission expires 7/30/2020